Filed 2/24/15  P. v. Machua CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY MACHUCA,<br><br>        Defendant and Appellant. | B253171<br><br>(Los Angeles County<br>Super. Ct. No. BA395354) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Affirmed.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Anthony Machuca appeals from the judgment entered following his conviction by jury of murder, with special allegations regarding use of a gun and association with a gang. Defendant was sentenced to 50 years to life and ordered to pay various fines and fees. He contends the trial court made two erroneous and prejudicial evidentiary rulings: (1) admitting statements by defendant's companion implicating defendant in the murder under the adoptive admission exception to the hearsay rule; and (2) excluding evidence of third party culpability that defendant claims raises a reasonable doubt as to his guilt. We find no error and therefore affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. Procedural Background

An information filed on November 26, 2012, charged defendant with one count of murder. (Pen. Code, § 187, subd. (a).)[1] The information further contained special allegations that defendant discharged a handgun, causing great bodily injury and death (§ 12022.53, subd. (d)), and that the offense was committed for the benefit of, at the direction of, and in association with, a criminal street gang (§ 186.22, subd. (b)(1)(C)).

Defendant pled not guilty and denied the special allegations. The jury trial commenced on August 14, 2013. On August 29, 2013, the jury found defendant guilty of first degree murder and further found the firearm and gang enhancements true. The trial court sentenced defendant to a total term of 50 years to life—a base term of 25 years to life with an additional term of 25 years to life for the firearm enhancement. Defendant timely appealed.

---

[1] All further statutory references herein are to the Penal Code unless otherwise indicated.

2

*B. Relevant Facts*

      *1. The Shooting*

At about 5:15 a.m. on January 29, 2012, Larry Guy was waiting at a bus stop on the corner of Broadway and 51st Street to catch the northbound bus to work. On the opposite side of Broadway, Guy saw Jose Carrasco and two other men walking southbound toward 51st Street. A man walked up to Carrasco and his companions from behind, said "Hey," and then shot Carrasco with what appeared to be a .38-caliber revolver. Carrasco fell and his companions ran around the corner. The shooter walked over to Carrasco and fired a second shot at close range. He then looked around, placed the gun in his waistband, and walked away. Carrasco died as a result of the gunshot wounds.

After the first shot, Guy got down on his stomach behind the bus bench so that he would not be seen. He continued to look toward Carrasco. As the shooter turned to walk away, Guy testified that he was able to get a good look at him and see his face.

Guy described the shooter as a Latino male, about 24 or 25 years old, about 5 foot 8 inches tall, with "close cut" hair and a slim build, wearing jeans, a "beige and checkered leather jacket" and white tennis shoes. Guy identified defendant as the shooter from two photographic "six pack" lineups, at the preliminary hearing, and at trial. He also identified a photograph of a beige jacket seized from defendant's house as the one worn by the shooter.

The shooting occurred in territory that was disputed heavily by the 50s and Playboys street gangs. Carrasco was an associate of the 50s.

      *2. Adoptive Admission*

Mike Sotelo, Carrasco's cousin, was working the walk-up window at a local fast food restaurant in February 2012. Sotelo had known defendant for several years and knew him by the nicknames "Trice" and "Felon." One evening, approximately one to two weeks after Carrasco's murder, defendant approached the window where Sotelo was

working, accompanied by an individual Sotelo knew as "Skooby" and a teenager whose name Sotelo did not know.[2] The teenager placed the order at the window with Sotelo.

While Sotelo was assembling their order, he overheard the teenager talking about how "they gunned down somebody" on 51st Street. Recognizing this as the location where Carrasco was shot, Sotelo asked the teenager what had happened. The teenager asked Sotelo "did you hear about the killing on Fifty-First?" Sotelo said yes. The teenager responded "yeah, that was us, that was the hood." Either Skooby or the teenager said that "we did that fool dirty." The teenager also asked Skooby if they were going to get caught, to which Skooby nodded. Sotelo, not wanting to give himself away as Carrasco's cousin, then asked the teenager "who did it?" The teenager responded "you know, that nigger Felon." Sotelo asked again, and the teenager again responded "Felon." Sotelo described the teenager's voice as "pretty loud" and said he was "excited" and "thrilled" when discussing the murder. When the teenager identified "Felon," defendant "looked around like if someone had called his name." Defendant looked at the teenager and then made eye contact with Sotelo for about "two seconds" but did not say anything. At that point, Skooby tapped the teenager, the teenager stopped talking, and the three men took their order and walked away. Sotelo estimated the three men were at the window for 10 to 15 minutes total.

Sotelo was inside the restaurant, four to five feet away from the walk-up window, when he first overheard the teenager. He then moved closer so that he could hear more. At the time the teenager identified "Felon," Sotelo testified that he was at the window and the teenager was right in front of him. Defendant and Skooby were on either side of the teenager, with defendant on Sotelo's left and Skooby on his right. Sotelo estimated that the teenager was about two to three feet away from Sotelo, Skooby was about three feet away, and defendant was about six to seven feet away. Defendant was facing the street,

---

[2]    Sotelo knew Skooby, whose real name was Fernie Duarte, and defendant as members of the Playboys street gang.

4

just "looking around" toward the street, until he turned to look at the teenager and Sotelo. There were no other people near the window at the time of this conversation.

### 3. Defendant's Arrest and Statements

On March 20, 2012, Los Angeles Police detectives arrested defendant and retrieved two brown jackets from his residence. After defendant waived his *Miranda*[3] rights, he admitted he had been a member of the Playboys street gang for two years and that his nickname was "Felon." Defendant had several tattoos related to membership in the Playboys gang. Defendant also admitted he and another Playboys member were responsible for graffiti at 49th Street and Broadway[4], including a marking "50-K" that defendant explained referred to the 50s gang and represented that he's a "50 killer." Defendant also described several confrontations he had with members of the 50s gang (but not with Carrasco) between September and November 2011, which caused defendant to obtain a .40-caliber Glock handgun. Defendant was detained in December 2011 by Los Angeles County sheriff's deputies, at which time they impounded his .40-caliber Glock semi-automatic handgun.[5]

### 4. 402 Hearing on Sotelo's Testimony

Prior to trial, the prosecution moved in limine for admission of the statements made by the teenager in Sotelo's presence.[6] Over defendant's objection, the court admitted the testimony under the hearsay exception for adoptive admissions. The court concluded that while the evidence was "not conclusive," it was a "factual issue" for the jury to determine whether, as defendant argued, he did not hear the discussion regarding Carrasco's shooting. But "given the surrounding circumstances, the distance, the loud

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436.

[4]     The graffiti was discovered by a LAPD detective about a month after the shooting.

[5]     The Glock was never returned to defendant.

[6]     The testimony detailed above reflects Sotelo's testimony at the 402 hearing on the prosecution's motion. Sotelo also testified at trial.

5

voice, the bragging, the fact that it went on for some time, the fact that [defendant] turned his head to the witness at the precise time that he was named as the assailant all is sufficient evidence from which the jury could find that he heard it."

### 5. *Defendant's Proffer Regarding Third Party Culpability*

On August 20, 2013, mid-trial, defendant filed a motion to introduce evidence of third party culpability. As an offer of proof, defendant provided the following evidence: several days after the shooting, detectives interviewed Juana Lozoya, Carrasco's girlfriend at the time of his death. Lozoya stated that on the night before Carrasco's murder, January 28, 2012, at approximately 8:00 p.m., she and Carrasco were walking to her residence when Carrasco was confronted by a "male Hispanic, who she knows as Ronny Wilson." Lozoya described Wilson as "extremely drunk and visibly upset" and said that he asked who from the "50th Street" gang was accusing his wife, Wendy Gonzalez, of stealing a gun. Wilson then lifted up his shirt, displaying an "unknown caliber revolver," and stated "I'll kill you, and all of the "50th Street" gangsters." Lozoya stated that she and Carrasco feared for their lives and left the scene.

In his motion, defendant also pointed to the phone records for Wilson and Gonzalez, which he argued showed phones that "were shut off at or about 1:00 a.m. and didn't turn back on until at or about 12:00 p.m." on January 29, 2012, "in order to make them and their users [sic] location untraceable." In actuality, the phone records show Wilson's phone sending a text message at 2:42 a.m. on January 29, 2012 and then no text activity until receiving a text at 12:18 p.m. Gonzalez's phone received the text message sent by Wilson at 2:42 a.m. and then sent a text at 5:06 a.m. that morning. The prosecution represented during argument on the motion that at the time the home address for Wilson was in Rialto, in San Bernardino County, and provided records showing that Wilson's phone made or received phone calls at 12:08 a.m. on January 29 and then no calls until 9:34 a.m. that morning, both using the same Metro P.C.S. cell site in Rialto, California, over 50 miles away from the location of the shooting. Gonzalez's phone used the same cell site at 12:44 a.m. on January 29 and then again at 9:57 a.m.

6

Finally, defendant asserted that the testimony of the eyewitness, Larry Guy, that the shooter used a "revolver" suggests that the gun used to shoot Carrasco was "the same type of gun" used by Wilson to threaten Carrasco the previous evening.

The trial court denied defendant's motion, noting that there was "nothing to connect" the gun Wilson purportedly displayed to the gun used to shoot Carrasco. Also, the court found that the phone records simply showed the phones were not used during the time of the murder, not that they were deliberately turned off as defendant asserts, and "[t]he fact that a phone isn't being used during the time that people are sleeping and so forth doesn't . . . convince me that it's suspicious." Thus, the court concluded, at best defendant could show motive and opportunity, but "you need something connecting [the third parties] either directly or circumstantially to the commission of the crime," which defendant could not show.

## DISCUSSION

Defendant contends the trial court erred in admitting Sotelo's testimony that defendant's companion identified him as the shooter and in excluding his evidence of third party culpability. As detailed below, we find no error on either issue. We therefore need not reach defendant's claims that these errors resulted in prejudice to him and violated his due process rights.

### A. Adoptive Admission

#### 1. Legal Principles

The Evidence Code defines hearsay as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless it qualifies under some exception to the hearsay rule. (*Id*., subd. (b).) The trial court allowed Sotelo's testimony under the adoptive admission exception, which permits admission of a statement offered against a party "if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) "In determining whether a

7

statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true." (*People v. Davis* (2005) 36 Cal.4th 510, 535.) Thus, "'[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' [Citations.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.)

The trial court has "broad discretion to determine whether a party has established the foundational requirements for a hearsay exception [citation]." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.) We review the trial court's conclusions regarding foundational facts for substantial evidence and the trial court's ultimate ruling for an abuse of discretion, "reversing only if "'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" [Citation]." (*Ibid*.)

### 2. Trial Court Did Not Err in Admitting Sotelo's Testimony

Defendant challenges the trial court's finding that there was sufficient evidence to permit a jury to conclude that defendant heard and understood the teenager's identification of defendant as Carrasco's shooter. Defendant contends there was no evidence other than defendant's "mere proximity" to show that defendant was paying attention to, or even heard, the conversation between the teenager and Sotelo regarding the shooting. As such, defendant argues that two inferences are equally possible—that defendant "was paying attention to the conversation all along and thus he had heard the accusations," or that defendant "was not paying attention to the preceding conversation,

8

hadn't heard the accusations, and had his attention instead aroused by the sound of his own name." Defendant therefore contends that "[t]here is no principled way to infer based on the evidence" which possibility actually happened, and therefore the jury could not reach a conclusion without impermissible speculation.

We disagree. In addition to defendant's proximity to the conversation between the teenagers, Skooby and Sotelo, Sotelo's testimony provided evidence that the teenager was discussing the shooting for several minutes in a loud and excited tone, that there were no other people or cars in between defendant and the others that might have obstructed his hearing, that the teenager identified defendant twice as the shooter in response to Sotelo's questioning, and that as soon as he did so, defendant turned and made eye contact with Sotelo, but said nothing. This evidence "supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide. [Citation.]" (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1011, disapproved on another ground by *People v. Loyd* (2002) 27 Cal.4th 997, 1008, fn. 12.)

As the trial court noted, the jury was free to weigh the evidence at trial and reject the inference that defendant heard, understood, and implicitly adopted the statement that he shot Carrasco. But the fact that two alternate inferences may be reasonably drawn does not necessarily reduce one's choice between them to speculation, nor does defendant cite any authority to support that theory. Here, Sotelo's testimony provides sufficient evidence for a jury to reasonably conclude that defendant heard the teenager identify him as the shooter. Therefore, the trial court did not err in admitting the testimony under the adoptive admission exception.

B. *Third Party Culpability*

1. *Legal Principles*

Any "relevant evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that a party other than the defendant committed the

9

offense charged," is admissible. (*People v. Hall* (1986) 41 Cal.3d 826, 829 (*Hall*).) Thus, "[t]o be admissible, the third party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." (*Id.* at p. 833.) However, "we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability . . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid.*) Moreover, relevant evidence of third party culpability is subject to the usual considerations under Evidence Code section 352 and may be excluded where its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion. (*Id.* at p. 834.)

We review a trial court's rulings on relevance and the exclusion of evidence under Evidence Code section 352 for abuse of discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 577.)

### 2. *Trial Court Did Not Err in Excluding Defendant's Proffered Evidence*

Defendant contends the trial court should have allowed him to present evidence to the jury suggesting that Wilson, rather than defendant, shot Carrasco. Defendant does not dispute that he was required to have some circumstantial evidence linking Wilson to the actual crime, beyond mere motive and opportunity. Rather, he argues that the evidence of Wilson threatening Carrasco earlier that evening, together with the possibility that Wilson possessed the same general type of gun—a revolver—that was used to shoot Carrasco was sufficient circumstantial evidence pointing to Wilson as the perpetrator to allow the evidence to go before the jury. But this argument is missing a crucial step, namely, any evidence actually linking Wilson or his gun to Carrasco's murder.

First, Wilson's threat to Carrasco eight or nine hours earlier, at most demonstrates motive. It does not provide any evidence linking Wilson to the crime scene or to the

10

actual shooting.[7] (See, e.g., *People v. Prince* (2007) 40 Cal.4th 1179, 1239-1241 [rejecting third party culpability evidence that victim's boyfriend had fought with her and previously threatened her with a knife, because it showed only motive].) Second, testimony that Wilson displayed an "unknown caliber revolver," during his confrontation with Carrasco does not connect Wilson's gun to the murder, and defendant offers no other evidence to reasonably support the inference that Wilson's gun was used to shoot Carrasco. Third, Wilson's and Gonzalez's phone records do not place either individual at or near the crime scene at the time of the shooting—if anything, they support the inference that Wilson and Gonzalez were in another county at the time. And while defendant posits that Wilson could have left his phone at home or "turned it off as he made his way to the scene," such speculation is not evidence that he did so.

Defendant does not cite any cases admitting third party culpability evidence based on such a thin showing. In fact, in *Hall*, the only case defendant cites, the circumstantial evidence linking the third party to the crime included unusual shoe prints at the crime scene and the third party's knowledge of unique details of the crime. (*Hall*, *supra*, 41 Cal.3d at p. 833.) Here, by contrast, there is no evidence connecting Wilson to the crime scene, the shooting, or the murder weapon. Although defendant argues that the trial court improperly "isolate[d] and marginalize[d] the evidence . . . piece by piece," he fails to point to a single piece of evidence reasonably linking Wilson to the crime. As such, we find no error in the trial court's exclusion of defendant's evidence of third party culpability.

---

[7] Following the court's ruling, Lozoya testified at a hearing on another issue. During that testimony, she admitted that Wilson's anger that night was mainly directed at another individual, not Carrasco, that Carrasco "calmed" Wilson down, and that Wilson did not threaten Carrasco with the gun "after they talked."

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


WILLHITE, Acting P. J.



MANELLA, J.